## UNITED STATES *v.* MEANS *et al.*

*(Circuit Court, S. D. Ohio, W. D.  December 24, 1889.)*

1. NATIONAL BANKS—FALSE ENTRIES TO DECEIVE OFFICERS—DIRECTORS.
   Directors of a national bank are "officers," within the meaning of Rev. St. U. S. § 5209, which makes it a misdemeanor for bank officers to make false entries in any book, report, or statement of the bank, with intent to deceive any of its officers.

2. SAME—INTENT.
   Under said statute, intention to deceive any one director or officer is as criminal as the intention to deceive all of them.

3. SAME—OFFICERS AS ACCOMPLICES.
   A conviction cannot be had under said statute where it appears that the officers alleged to have been deceived were accomplices in the speculation, to hide which the false entries were made.

4. SAME—PRESUMPTION OF INTENT—REBUTTAL.
   If such false entries had a natural tendency to deceive the bank officers, the fact that defendants deny having had any such actual intent cannot rebut the presumption of intent arising from the nature of the entries themselves.

5. SAME.
   In such case the fact that the officers in question were not actually deceived is not conclusive proof of the absence of intent to deceive.

6. CRIMINAL LAW—EVIDENCE OF GOOD CHARACTER.
   Proof of good character is no defense against crime actually committed, but is a circumstance in favor of the defendant, in cases where there is doubt as to commission of the crime.

7. SAME—REASONABLE DOUBT.
   Reasonable doubt is an honest misgiving, generated by the insufficiency of the proof.

At Law.  Charge to the jury.

Indictment of William Means and John R. De Camp for a violation of Rev. St. U. S. § 5209, which provides that "every president, director, cashier, teller, clerk, or agent of any association * * * who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association, * * * or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association, * * * shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years, nor more than ten."

*John W. Herron* and *Henry Hooper*, for plaintiff.

*Charles W. Baker* and *Samuel F. Hunt*, for defendant Means.

*Jackson A. Jordan* and *Isaac M. Jordan*, for defendant De Camp.

HAMMOND, J., *(charging jury.)*  Obviously, this trial has been one of grave concern to the people of Cincinnati.  The defendants have each established, by the best proof, a reputation for honesty and integrity at the time of the transactions involved which is beyond all question.  Naturally, this would be so; for, without such a reputation, one would not be allowed to occupy the place of president or vice-president of a national bank.  Whether honest or dishonest in fact, one admitted to such places must have at least an assured reputation for integrity; and hence it is that the class of offenses denounced by the banking act of congress always

concerns men of the highest standing, for none others can become bankers, and employes of banks. · This accounts, also, for the very severe penalties attached by congress to a violation of those laws, rules, and regulations made to protect the people of the United States in their use of that national banking system which they have established by law, and which is so useful to them. Congress departs from its usual custom in criminal legislation, and does not permit the court to determine the minimum punishment, but for itself declares that, if men of the high character employed in the national banks shall violate the laws made to protect the system from wrong-doing by those engaged in the trust imposed by it, they deserve, and shall receive, not less than five years' imprisonment. Congress feared that courts might yield to such influences as were improper, and lightly punish reputable men for doing the forbidden acts by which they would desert the important trusts which congress was determined to protect by these penalties. Therefore, to neither court nor jury has been left the power to condone these offenses by imposing nominal or slight punishment, as in other classes of our criminal laws. The act itself is a protest against allowing our sympathy for fallen pride to control our judgment in such cases. Wherefore, the court must caution you that, while we do not come "with the war-whoop and scalping-knife of savages," to use the language of counsel, nor without all charity for the misfortunes and mistakes of men, nor, indeed, without a participation in that profound sympathy which we observe pervades this city and shelters the defendants,—one of them, at least, to an extraordinary degree, because of his eminence in all the relations of life, and his connection with the good people of this city in high places of public and private confidence,—we do come to do our duty, and, in obedience to the oaths we have taken, "to administer justice without respect to persons, and do equal right to the poor and to the rich," and "a true verdict render, and a true deliverance make, according to the law and the testimony." This is the measure of our duty, and this alone. If these defendants are guilty, you must "a true verdict render," and say so; if not guilty, likewise "a true verdict render, and a true deliverance make," by saying so. That you will do this bravely and honestly, and with impartiality, this court does not in the least doubt. After all that has been said in the argument, and so well said on both sides, it is not necessary to go over this whole case, in its multitude of details, and to comment upon the testimony in all its bearings; and I shall not attempt that treatment.

The object of the statute, so often read in your hearing, about making false entries, or causing them to be made, is to secure at all times a truthful exhibit of the condition of the bank. The requirement of a report to the comptroller of the currency is intended to secure that supervision of the bank which the government assumes in the interest of the system, and of the people who resort to it on the invitation of the government, when it establishes the system, and promises to protect it by wise legislation. The object of making publication in the newspapers is to inform

the public of the exact and true condition of the bank. To falsely represent the facts, and to make a false publication of them, is, undoubtedly, a crime, under this act, no matter if it be done to save the bank. It is the very thing the banker is forbidden to do. That the public shall be truly informed, no matter how disastrous the truth may be to the bank itself, is the command of congress, made in the interest of the public. It is this publicity more than anything else which shall secure fidelity in the administration of the bank. It is the ruin that will come to the bank if mismanagement be published which is relied upon to secure the public, and those interested in the bank, against mismanagement; and therefore the fear of ruin to the bank is no excuse for falsely publishing its condition to the public, and cannot shield the banker from the crime of a false publication.

We are inclined to think also, that it is a crime, under this act, to make a false report to the comptroller, with whatever motive, because there inheres in that act, necessarily, an intent to deceive the agents appointed by him to inspect the bank, if he be not himself such agent, as it may be he is; just as there inheres in the very act of publishing a false statement to the public the statutory intent to injure "any other company, body politic or corporate, or any individual person," which phrase is used to mean the public itself; and no given company, body politic or corporate, or individual person need be named or proved as the victim of the injury, as no given "agent appointed to examine the affairs of the association" need be named as the victim of that particular deceit.

Referring, also, to a former clause of this act, we are inclined to think that, if anything is established by this proof, it is that the directors who entered into the syndicate to purchase the stock of the bank by stripping the bank itself of the money necessary to pay for it, under the circumstances shown here of taking the money under the guise of loans to themselves without any security, or upon inadequate security, were guilty of abstraction or willful misapplication of the funds of the bank. It was this desertion of their trust that brought upon them the dire necessity of making false reports and entries, no doubt; but it furnishes, certainly, no excuse for doing that thing, and makes the doing of it none the less a violation of this law. But, strange to say, neither these defendants, nor those who were jointly concerned in these violations of the statute along with them, have been charged by this indictment with any of the offenses which we have just named, but only with another offense, which, in relation to the facts of this case, is more difficult of proof, and will give you the most trouble. The guilty intention as to those other offenses grows out of the very facts themselves, beyond all question; but, as to that selected for this indictment, the guilty intention is fairly a matter of dispute, and that dispute you must settle here and now. It is about the only dispute in the case. All others are important only by relation to this, and the bearing they will have upon its solution by you. We must therefore caution you that you are not trying these defendants, upon the facts in proof before you, for any wrong-doing as to the funds

of the bank, nor any as to the public, by deceiving it by the publication in the newspapers, nor any as to the comptroller or his agents, however clearly, to your minds, the facts may establish those offenses. But you are to try only the question whether the false report or the false entries in the books which have been named in the indictment, and so often repeated to you in the argument, were made with intent to deceive any officer of the bank. The line of demarkation here must be clearly drawn by you; and you must not allow your verdict to convict the defendants of any other offense than that charged, however clearly you may see those other offenses in the facts of this case. With this necessary caution, we will now consider the case in its relation to the disputed intent as to the officers of the bank.

In the orderly consideration of the subject, your first inquiry would be, who are the officers of the bank referred to by this act of congress? By the rule of association of words in the statute, first clearly pointed out by Mr. Hooper, there cannot be much doubt that congress conceived that a teller is one of the officers of the bank; and this is, undoubtedly, the general understanding outside of banks, as shown by the definition of the word by lexicographers, laymen, and lawyers, and by the books on banking found in our law libraries. We think that the decisions of the supreme court of the United States also indicates that the word has been so understood by that tribunal. Yet congress was not organizing a bank by this statute, nor was it declaring who should or should not be the officers of the bank authorized by this banking act. On the contrary, by another section, the power is given to the board of directors to appoint "other officers," after having named the president, vice-president, and cashier as three of them that are fixed in the organization, and also power to define their duties, etc. We think, therefore, that it depends on the circumstances connected with the bank itself whether the teller is an officer, or only an employe or clerk. We find in the action of the board of directors and the by-laws of the Metropolitan National Bank no evidence that the teller was appointed or treated as an officer in that bank, but, on the contrary, that he was regarded as a clerk, and that the custom of banks is that way in Cincinnati. We wish to reserve any opinion whether or not this would be, if at all, a controlling consideration in construing this act, if some false entry were made with especial reference to the duties of the teller, under circumstances showing a well-defined purpose to deceive him to the injury of the bank. This question of being an officer or not—being an officer under this act, and under all similar acts—may depend on the very especial circumstances of each case. But, on the circumstances here, it is plain that Roth, the paying teller, had no duties or business relations connected with these false entries that would make a deception as to him either desirable or necessary; and this circumstance, taken in connection with all else that is in the case, negatives the idea that there could have been an intention specifically to deceive him, or generally to deceive a paying teller. And, since we would not support a verdict based on the facts in this case in

their relation to the paying teller, we may at once advise you to discard him from your consideration as one of the officers.

The facts might be submitted to you, so far as they concern the receiving teller, Reigel. He did have a necessary connection, in his capacity as receiving teller, with these transactions. Indeed, he made some of the very false entries under consideration, and it was through him, in that relation, that the falsity must get upon the books. Any deceit of his to accomplish that purpose might be criminal; for this relation of officer to the bank, under this statute, depends on the exigencies of the situation, and the functionary's particular duty in that business which is in hand. It is an elastic word; and, in aid of the general purpose of congress in the public interest, as involved in this legislation, the word may be made to include functionaries not generally considered officers in rank, but having duties to perform which in fact belong to the category of official acts, as indicated by the statute. *U. S.* v. *Trice*, 30 Fed. Rep. 490. And this is not a violation of the rule of strict construction for penal acts, of which we are not unmindful. Id.; *U. S.* v. *Huggett*, 40 Fed. Rep. 636. But the government does not claim that in this case there was any purpose to deceive Reigel, either generally or specifically; and, if it did, there is no proof of such general or special intent, as to him. He was a cheerful and ready accomplice in the nefarious business of promulgating a false report to deceive the comptroller and the public. It was only a question of method, not morals, with him. And we imagine that this proof raises a strong presumption that the same may be said of others involved in that business, of higher rank than Reigel, though it is not confessed upon the witness stand. But of this you are to be the judges, and not the court; though we are in duty bound to submit that question, with the rest, to you. There is not the least doubt, as to Reigel, that he had full knowledge, was not deceived in fact, and that there was not the least occasion or necessity for deceiving him with false entries in order to deceive the comptroller and the public. And so we may advise you to discard him also, in your consideration as to the officers of the bank; and this, whatever view you may take of the word "officer" in the statute.

As to the directors there is not the shade of doubtful construction of this act. They are not only officers, but managers, of our national banks. They come within every sense and meaning of the word "officer," and are within the rule of the association of words in the act already referred to, and of the decisions cited. This act is not like those construed in *Association* v. *Hayes*, 4 Abb. Dec. 183, and *Com.* v. *Christian*, 9 Phila. 556. The president and vice-president are only directors with official titles, and charged with doing in detail what the directors are charged with doing generally. They are only agents of the directory; and it is well enough that these cases should teach the directors of national banks that they cannot, by inactivity, neglect of duty, and inattention, shirk their responsibility or escape their share of blame for such wrong-doing as is displayed in this proof, in plain violation of this act of congress. They are

the managing officers of the bank; and this statute against false entries protects them against deceit, and was intended to do so. Hence, if you believe from the evidence in this case, beyond a reasonable doubt, that the defendants, in the execution of their confessed purpose to deceive the comptroller and the public, found it necessary to deceive Roth, Duckworth, Gerke, Bonte, and Ryan, or any of them, and made the false entries with that intent, these defendants are guilty, and you should say so. Or, if you believe from the evidence, likewise beyond a reasonable doubt, that, in the execution of their confessed purpose, they found it necessary to deceive the cashier, Edwards, and made the false entries with that intent, then, also, are they guilty, and you should say so. Intention to deceive any one director or officer is as criminal, under the act, as the intention to deceive any number or all of them.

But if you believe from the evidence that these men were engaged in a common cause, were embarked in a more or less common enterprise of speculation, were involved in a more or less common peril, were impelled by a more or less common necessity to put forth a false report about the condition of the bank, of which they had full knowledge, and to make false entries of conformity upon the books,—we say, if you believe all this, you should not convict these defendants. Even common criminals, engaged in common enterprises, do not find it essential to deceive each other, except when they come to divide the fruits of crime; and we are of the opinion that offenders under the particular clause under which this indictment is drawn may so include all the officers of a bank, by combination among them, that all intent to deceive any officer by any one of the offenders would be quite impossible. It is for you to say whether that is the condition, as shown by this proof, or whether the facts are as the government insists they are: that these defendants had to deceive Edwards, Roth, and Duckworth, and the rest, in order to deceive the comptroller and the public. The district attorney does not claim, nor is there any proof, that Directors Ryan and Bonte were involved in the confessed wrong-doing, either as to the syndicate operations or as to the false entries; nor did the defendants rely upon any participation by them in the "enterprise," as they call it. The district attorney claims that they were deceived, necessarily, by the false report and the false entries in the books. It is for you to say if this be so beyond a reasonable doubt. Their duty of supervision was plain. Their power to check the wrong-doing, when coming to their knowledge, was undoubted. Now, did the defendants intend to deceive them in order to prevent the exercise of that power, or to procure their quiescence?

Too much stress on both sides of the argument has been put upon a bare, naked intent to deceive some person for the mere purpose of deceit. That is not what the statute means. It means a deception which has a purpose behind it to accomplish, an end to gain, a design to carry out, or an aim to be attained. That is the legal definition of "intent," as applied to an intention to deceive, as well as any other. Hence, when you consider this subject, as to Ryan and Bonte, for example, you may

determine whether the proof shows beyond a reasonable doubt that deceiving them was desirable, and an object to be attained, or whether it shows that they were inert, inattentive, and not actively watching affairs, because of illness, or for other cause, and, therefore, the defendants could not have intended to deceive them. Gerke was absent; and you may say how far that fact has any influence on the question of an intention to deceive him; and, as to all three, whether the conduct of the defendants in relation to them was of a kind to show an intention to deceive them by the false entries or not, and this beyond a reasonable doubt. It is to be determined by all the proof. Now, reasonable men are held to intend that which is the result of their conduct in the premises; and, if the false entry is calculated, under the circumstances of the case, to deceive, the defendants cannot say they had no such intention. They may even swear to its absence; but, if the circumstances show that the natural and probable consequences were the deceit which has been described to you, their assertion cannot prevail over this fact, in making up your verdict. It depends wholly on the peculiarities of the case, the character of the transaction, and the nature of the intent described by the statute, as to how you shall apply this rule. If congress had said that all false entries, willfully made, should be punished by imprisonment, as it might have said, and probably ought to have said, then the doing of the act or false entry would be in itself a crime; and the wrongful intent to violate the statute, to disobey the law, and bring about any natural and probable consequences, would be conclusively inferred by you as a fact, and no meritorious purpose could prevail against that inference. But congress has not said that all false entries shall be forbidden, but only, as applicable here, that these made with intent to deceive the officers shall be forbidden; such deceit as we have described, with a purpose and design behind it of accomplishing that deceit, possibly for some other purpose or design ulterior to the other, which is immaterial, except as a circumstance of evidence in showing whether the forbidden and criminal intent existed or not. There may be more than one intent in an act, and they may co-exist reasonably and fairly in the peculiar facts of the given case. On the other hand, on the given facts, the confessed intent may be of a kind to wholly exclude the forbidden intent.

It is not necessary to enter upon, or be confused, by the metaphysics of the subject. Practically, you are to judge, on the proof, whether the forbidden intent is an inexorable inference from the proven facts, or is excluded by them, or is a matter of reasonable doubt. *U. S.* v. *Jackson,* 25 Fed. Rep. 548. Let us illustrate this process of judgment, for your guidance. If Edwards, Roth, and Duckworth are found by you to have been men of that stern quality that under no circumstances would the one swear to a false statement known by him to be false, nor the others to attest that falsehood officially, when known by them to be a falsehood, does not the necessity of deceiving them into making the oath and attestation at once appear? Does the proof show this? It is for you to say. If this be true, as you find, would it not be a potential circumstance to

show that the defendants intended, and must have intended, to deceive them, and accomplished that intention? But if, on the other hand, the proof shows that they were willing and anxious, and under the same stress as the others, to deceive the public, for any purpose, is it not equally as plain that the fact of their willingness and stress of necessity excludes any intention to deceive them, at least? De Camp was a director; and he, too, attested the falsehood. Does the government claim, or can it claim, that the defendant Means had a design to deceive him? If not, why not? Was there any more occasion to deceive Roth or Duckworth than De Camp? It is for you to say, on the facts, how this may be. The defendants say these two and Edwards were as deep in the mire, in this transaction, as they, which inculpation these witnesses deny; and the proof is before you, not to convict them, for they are not indicted, but to determine whether the defendants are reasonably and fairly to be held to have intended to have deceived them by the false entries.

As to all these officers, the fact of deceit, in fact, is a circumstance of proof to aid you in determining the intention to deceive them, but not a conclusive circumstance; for one may be deceived when there was in fact no intention to deceive him. On the other hand, again, as to all these officers, the circumstance, if you find it so, that one as to whom the defendants intended deceit was not in truth deceived, is not conclusive against the intention to deceive; for one shall not escape because the design to be accomplished by an intended deceit failed of its purpose.

Thus it is, gentlemen of the jury. You go over the proof, in all its details,—all the proof,—and weigh it well, and determine this fact: Did these defendants intend to deceive the officers of the bank by these false entries, and are you satisfied of this, beyond a reasonable doubt.

Before we come to the law of reasonable doubt, let us say something as to the effect of proof of character, in your process of weighing the evidence and applying it to this issue. Character of the highest kind is no defense against crime actually committed. But where it is a matter of doubt, on the facts, whether any crime has been committed, character is a circumstance to turn the mind in favor of the defendant. If one occupying a room with you in the public inn leaves, in the night, with your money, and, with hue and cry, you follow, to find that he has appropriated it to his own use, no amount of good character, or number of witnesses to it, would save the culprit. But if you found the man with the money intact, and no incriminating circumstances, except its possession, and his having left you with it stealthily, his good character would naturally turn your judgment in his favor, and you would accept his explanation of somnambulism, or of practical jesting, or what not, as true, if not satisfactory. In other words, character will explain equivocal conduct in favor of innocence, but will not outweigh satisfactory proof of guilt.

But we have constantly said that you cannot convict unless you are satisfied of guilt beyond a reasonable doubt. What does this mean,— "reasonable doubt?" A reasonable doubt is an honest misgiving, gen-

erated by the insufficiency of the proof, which your reason sanctions as a substantial doubt. If, after you have weighed all the evidence, on your oaths to try the question of guilt according to the law and the testimony, and looking to all the proof, and only to the proof, you impartially and honestly entertain the belief that these defendants may be innocent of the offense charged against them, they are entitled to the benefit of that doubt, and should be acquitted. A doubt suggested merely by the ingenuity of counsel, or of your own, or one born only of a merciful desire to permit the defendants to escape the penalty of the law, or one not connected with the testimony, is not a reasonable doubt. It must be created by an inadequacy of proof, so great that you are not reasonably satisfied of the guilt of the defendants. It must grow out of the proof as being insufficient to convince you, or as being of doubtful quality, or both; and it may arise out of a total or partial want of proof, out of the bad character of witnesses, whose credibility you reasonably doubt, or out of any other infirmity in regard to it, whether the witnesses, or any of them, be of doubtful character or not. Cross-examination and adverse testimony is intended to develop any such infirmity; and you look to all the proof on both sides to determine the question of guilt or innocence, and must, upon the whole, have no such doubt as has been described, or you cannot convict.

On request as to "jurors unknown," I say that this averment in the indictment does not mean that the officers of the bank were not known to the grand jury, but that which of them was deceived was not known so as to be specified.